J-S86028-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| A.W. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| M.A. | |
| Appellee | No. 986 WDA 2016 |

Appeal from the Order June 14, 2016
In the Court of Common Pleas of Crawford County
Civil Division at No(s): A.D. NO. 2010-372

BEFORE:  GANTMAN, P.J., MOULTON, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY MOULTON, J.:                          **FILED JANUARY 13, 2017**

A.W. ("Father") appeals from the June 14, 2016 order entered in the Crawford County Court of Common Pleas, which awarded M.A. ("Mother") sole legal custody of J.A.W. ("Child") and reduced the custody time granted to R.M.H. ("Paternal Grandmother").  We affirm the trial court's reduction of Paternal Grandmother's custody time.  However, because Mother did not request a modification of legal custody, the parties did not address legal custody at the *de novo* hearing, and Father was not on notice that legal custody would be at issue, we vacate that portion of the trial court's order awarding Mother sole legal custody.

---

[*] Former Justice specially assigned to the Superior Court.

This case has a lengthy history, which we set forth to put in context the issues raised by this appeal. Child was born in July 2006. Father is incarcerated at the State Correctional Institution at Fayette ("SCI-Fayette") and will not be eligible for release until 2028. *See* Memorandum & Order, 6/14/16, at 1 ("Mem."). Father initiated this custody action by filing a complaint on March 8, 2010. Following custody mediation, on April 28, 2010 the trial court awarded Mother and Father shared legal custody, awarded Mother primary physical custody, and directed Mother to bring Child to SCI-Fayette twice per month to visit Father.

Soon after entry of this order, Mother began to experience financial difficulties that prevented her from bringing Child to visit Father.[1] On October 25, 2010, Father filed a contempt petition against Mother seeking enforcement of his right to visitation.[2] On November 24, 2010, Mother filed a petition to modify the custody order, alleging that she could not afford to

---

[1] Mother filed a petition to modify custody on June 28, 2010. However, the trial court dismissed this petition without prejudice for failure to attach the current custody order as mandated by the Crawford County Local Rules of Civil Procedure.

[2] Father filed a second contempt petition on November 4, 2010. The trial court dismissed this petition for failure to attach the current custody order as mandated by the Crawford County Local Rules of Civil Procedure. Further, the trial court noted that the filing was duplicative of the petition filed on October 25, 2010, but granted Father the right to raise any new matter in the November 4, 2010 petition at the contempt hearing scheduled for November 29, 2010.

bring Child to SCI-Fayette twice per month. On November 29, 2010, following a contempt hearing,[3] the trial court found Mother in contempt of the custody order and directed that Mother and Paternal Grandmother[4] bring Child to SCI-Fayette to visit Father on December 9, 2010, and that Mother bring Child to SCI-Fayette for a visit on December 17, 2010. The trial court imposed no further sanctions. On December 13, 2010, Paternal Grandmother filed a petition to intervene, which the trial court granted. Father filed another contempt petition on December 20, 2010, claiming that Mother failed to bring Child to the December 9 visit and that Mother's living situation had changed.[5]

After a custody mediation session,[6] the trial court issued a new custody order on February 4, 2011. The trial court modified the previous order to include Paternal Grandmother in one of the two monthly visits to Father and ordered that Paternal Grandmother provide transportation and pay the costs of that visit. On February 14, 2011, Paternal Grandmother

_____

[3] Father participated by video conference.

[4] The record is unclear as to how Paternal Grandmother became subject to the contempt order prior to her petition to intervene.

[5] While a hearing on this contempt petition was originally scheduled for January 24, 2011, it was not held until March 18, 2011, as both Mother and Paternal Grandmother filed motions for continuances, which the trial court granted.

[6] This custody mediation addressed Mother's November 24, 2010 modification petition.

filed a request for a hearing *de novo*, and Father filed a similar request on February 17, 2011. The trial court granted these requests and scheduled a hearing *de novo* for August 3, 2011.

On February 8, 2011, Father filed another contempt petition, alleging that, during the custody mediation, Mother agreed to bring Child to visit Father on January 20 and January 30, 2011, which Mother failed to do. On March 18, 2011, the trial court heard both outstanding contempt petitions and, pursuant to an agreement of the parties,[7] ordered Mother to take Child to visit Father on the first Thursday of each month and Paternal Grandmother to take Child to visit Father on the third Sunday of each month. Finally, the trial court ordered a series of make-up visits, where Mother was to take Child to visit Father on the second Thursday of April, May, and June of 2011.

On May 16, 2011, Father filed a special relief petition, alleging that Mother was "moving from one place to another every [t]hree[] to [s]ix[] months[, . . .] jumping from [o]ne[] relationship to another," and failed to bring Child for his visit on the second Thursday of April. That same day, Father also filed a contempt petition, alleging the same facts as the special relief petition. Father also filed a motion to compel compliance, asking the trial court to issue an order to compel Mother to comply with upcoming

---

[7] Father participated by video conference.

scheduled visits. On May 19, 2011, the trial court dismissed the special relief petition without a hearing and scheduled a hearing on the contempt petition and motion to compel on the same date as the *de novo* hearing, August 3, 2011. On May 24, 2011, the trial court moved the hearings to June 29, 2011. However, because of Father's transportation issues,[8] the trial court continued the hearings to October 18, 2011.[9]

The trial court held a *de novo* hearing on October 18, 2011; Father was physically present. At the hearing, all parties agreed to a new custody order, and Father withdrew all of his pending contempt petitions and motions. Under the new custody order, Mother and Father were again awarded shared legal custody and Mother was awarded primary physical custody. However, the trial court also granted Paternal Grandmother periods of partial physical custody, every other weekend and on alternate

_____

[8] After the trial court moved the *de novo* hearing to June 29, 2011, on June 20, 2011, Father filed a motion to transport, asking the trial court to order the Crawford County Sheriff's Office to transport him from SCI-Fayette for the hearing. On June 22, 2011, the trial court denied the motion, noting that the Sheriff indicated that his office could not arrange transportation on such short notice. Thus, in order to protect Father's interests and ability to participate, the trial court continued the hearing to allow Father to arrange transportation with the Sheriff or by other means allowing him to participate in the hearing.

[9] On October 7, 2011, Father filed another contempt petition, claiming that Mother did not bring Child for a make-up visit.

Fridays,[10] as well as temporary physical custody for portions of Thanksgiving and Christmas, and one week of custody during the summer.[11]

On June 4, 2015, Mother filed the petition for modification of the custody order that gave rise to the order at issue in this appeal, seeking more holiday custody time with Child and informing the trial court that Child wished to have less custody time with Paternal Grandmother.[12] Mother's petition for modification did not request a change in legal custody. After a brief delay[13] and a custody mediation, the trial court modified the custody

_____

[10] The trial court granted Paternal Grandmother custody beginning on Saturday after Child's bowling or, if there was no bowling or it was summer, 10:00 a.m. Saturday until Sunday at 7:00 p.m. or, if the Paternal Grandmother took the child to visit Father on Sunday, whenever the Child returned to Crawford County.

[11] Between December 2011 and December 2013, Father and Paternal Grandmother each filed a contempt petition. The issues in these contempt petitions are not germane to our review.

[12] Mother alleged the following in her modification petition:

> [Paternal Grandmother] feels that the only Holidays that we observe for the Court Order is Thanksgiving and Christmas. Holidays need to be specified in our Order. Also, [Child] wishes to speak to the Courts about the visitations times with the Paternal Grandmother, as he wishes to have them lessened.

Mother's Modification Pet., 6/14/15.

[13] Mother's petition to modify contained an averment that a person living in Mother's household, J.M., had been convicted of driving under the influence and assault. In accordance with 23 Pa.C.S. § 5329, Mother filed a motion to schedule an evaluation hearing before the judicial hearing officer,
*(Footnote Continued Next Page)*

order on September 2, 2015. The order clarified the custody schedule by excluding Paternal Grandmother's one week of summer custody from the weeks of Memorial Day, Labor Day, or Independence Day, and provided Paternal Grandmother with two more hours on Thanksgiving and Christmas.

On September 21, 2015, Mother requested a *de novo* hearing, which the court held on March 23, 2016; Father participated by video conference. On June 14, 2016, the court issued a memorandum and entered the custody order now on appeal. The trial court awarded Mother sole legal custody of Child, and reduced Paternal Grandmother's weekend custody.[14] The trial court also decreased Paternal Grandmother's custody time on Thanksgiving and Christmas, granting custody between noon and 5:00 p.m. Paternal Grandmother's one week of summer custody was also removed and replaced with extended custody during the summer on the second Saturday of the month until Sunday at 6:00 p.m.

*(Footnote Continued)* ——————

which the trial court granted on June 26, 2015. After a hearing on July 16, 2015, the trial court found, based on the recommendation of the hearing officer, that J.M. did not pose a threat to the child and allowed mediation to proceed.

[14] The trial court awarded Paternal Grandmother custody between 10:00 a.m. and 6:00 p.m. on the second and fourth Saturday of each month. If, however, Paternal Grandmother notifies Mother on the second Saturday that she intends to take Child to see his Father on the fourth weekend, then the period of custody on the fourth weekend extends to Sunday when Child returns to Crawford County. Paternal Grandmother forfeits her second Saturday of custody if she fails to return the child on Saturday at 6:00 p.m. unless he is visiting his Father.

Father filed a timely appeal on July 1, 2016. After Father filed his statement of matter complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925 ("Rule 1925"), the trial court filed a Rule 1925 opinion, which adopted in full its June 14, 2016 memorandum.

Father raises the following issues on appeal:[15]

1. Did the lower court abuse its discretion when it stripped [Father] of his custody rights?

2. Did the lower court discriminate and abuse its discretion when it stripped [Paternal Grandmother] of everything it had granted her previously and when it ruled [Paternal Grandmother] is to bare [sic] the responsibility and cost for transportation of the child to see his father, which is the responsibility of [Mother]?

Father's Br. at 3 (suggested answers omitted).

We consider Father's issues mindful of our well-settled standard of review.

> We review a trial court's determination in a custody case for an abuse of discretion, and our scope of review is broad. Because we cannot make independent factual determinations, we must accept the findings of the trial court that are supported by the evidence. We defer to the trial judge regarding credibility and the weight of the evidence. The trial judge's deductions or inferences from its factual findings, however, do not bind this Court. We may reject the trial court's conclusions only if they involve an error of law or are unreasonable in light of its factual findings.

---

[15] As of the date of this memorandum, Mother and Paternal Grandmother had not submitted briefs to this Court.

***S.W.D. v. S.A.R.***, 96 A.3d 396, 400 (Pa.Super. 2014) (internal citations omitted).

When a trial court orders a form of custody, the best interest of the child is paramount. ***See J.R.M. v. J.E.A.***, 33 A.3d 647, 650 (Pa.Super. 2011). The trial court must consider all 17 factors enumerated in section 5328 of the Child Custody Act.[16] ***See S.W.D.***, 96 A.3d at 401. Further,

---

[16] Section 5328 of the Child Custody Act provides:

> In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
> (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.
> (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
> (3) The parental duties performed by each party on behalf of the child.
> (4) The need for stability and continuity in the child's education, family life and community life.
> (5) The availability of extended family.
> (6) The child's sibling relationships.
> (7) The well-reasoned preference of the child, based on the child's maturity and judgment.
> (8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where

*(Footnote Continued Next Page)*

when awarding partial custody to grandparents who have standing under 23 Pa.C.S. § 5325(2), the trial court must consider "(i) the amount of personal contact between the child and the party prior to the filing of the action; (ii) whether the award interferes with any parent-child relationship; and (iii) whether the award is in the best interest of the child."  23 Pa.C.S. § 5328(c)(1).

Father argues that the trial court inappropriately awarded Mother sole legal custody of Child.  According to Father, the trial court erred as a matter

*(Footnote Continued)* —————————

> reasonable safety measures are necessary to protect the child from harm.
> (9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.
> (10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.
> (11) The proximity of the residences of the parties.
> (12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.
> (13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.  A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.
> (14) The history of drug or alcohol abuse of a party or member of a party's household.
> (15) The mental and physical condition of a party or member of a party's household.
> (16) Any other relevant factor.

23 Pa.C.S. § 5328(a).

of law and abused its discretion by addressing legal custody *sua sponte*, as none of the parties had requested a change in legal custody. Father's Br. at 11. Father also argues that this award "forecloses any input the father may provide in [Child's] life and give[s] [F]ather authority in name only, . . . depriv[ing] him of a legal remedy because he was already awarded shared legal custody previously." **Id.** (citation omitted).

We conclude that the court erred as a matter of law by modifying legal custody without any request before it and without providing Father of any notice or opportunity to be heard on that issue.

In **P.H.D. v. R.R.D.**, 56 A.3d 702 (Pa.Super. 2012), we addressed an analogous situation in which a mother filed a contempt petition, alleging that Father had violated the order "to have no contact with the children other than supervised visits" by appearing at one child's band concert. **Id.** at 704. At the hearing on the contempt petition, the trial court, without request, "clarified" the child custody order by explaining that the father was "not to appear at places where the children would be reasonably expected to be." **Id.** at 704. Father appealed, arguing that the trial court abused its discretion and/or erred as a matter of law "by . . . modifying the custody order notwithstanding its failure to conduct a modification hearing." **Id.** at 705-06.

We concluded that the trial court's "clarification" was a modification of the custody order and that modification denied the father his due process rights because he was never given notice that custody would be at issue:

- 11 -

It cannot be gainsaid that these purported no-go zones were not contained in the previous custody arrangement, which was already highly restrictive. Under the trial court's new "clarification," Father is no longer permitted to attend school activities, community activities that Children will likely attend, or even restaurants and stores that Children might visit. This is a significant departure from the previous order that limited Father's time spent with Children to supervised visits. Most important, the parties were not on notice that such a breathtaking set of restrictions was sought, nor that it could be ordered, particularly in a scenario where the contempt petition is itself *denied.*

The trial court not only modified the custody order. It did so without any modification petition. It did so without notice and a hearing tailored specifically to custody modification. It denied Father his due process rights. Our decision in **Langendorfer** [**v. Spearman**, 797 A.2d 303 (Pa.Super. 2003),] is instructive. In that case, the mother filed a contempt petition alleging that the father willfully violated the custody order. In a subsequent order, the trial court found the father in contempt, granted the mother sole legal and primary physical custody, and restricted the father's visitation with the children to supervised visits. We found that the father's due process rights were violated because he had no notice that custody was at issue.

*Id.* at 707 (emphasis in original) (internal citations omitted). In arriving at this conclusion, we relied extensively on **Langendorfer**, stating:

In addition to the foregoing, we emphasize that Father's due process rights were violated by the actions taken by the court, because Father had no notice that custody would be at issue in the proceedings. "Notice, in our adversarial process, ensures that each party is provided adequate opportunity to prepare and thereafter properly advocate its position, ultimately exposing all relevant factors from which the finder of fact may make an informed judgment." [**Choplosky v. Choplosky**, 400 Pa.Super. 590, 584 A.2d 340, 342 (1990).] Without notice to the parties that custody was at issue, the trial court could not "assume that the parties ha[d] either sufficiently

exposed the relevant facts or properly argued their significance. Consequently neither we nor the trial court can make an informed, yet quintessentially crucial judgment as to whether it was in the best interests of the [child] involved to give sole legal [and physical] custody to the mother." *Id.* at 343.

*Id.* at 707-08 (quoting *Langendorfer*, 797 A.2d at 308-09) (footnotes omitted). Based on *Langendorfer*, we concluded that "the trial court abused its discretion in altering the terms of custody when a petition requesting such relief was not before it," because the father was unaware that custody was at issue and therefore "had no opportunity to prepare for a modification hearing." *Id.* at 708. In light of this abuse of discretion, we vacated the trial court's custody modification and instructed the parties that if either one of them sought modification, "that party must petition the court accordingly" and, "if the court schedule[d] a hearing on the modification petition, the opposing party is on notice that custody modification will be at issue." *Id.*

The principles of notice elucidated in *P.H.D.* and *Langendorfer* are applicable to this case. While unlike those cases, Mother did file a petition for modification, she sought only to clarify the physical custody schedule and reduce Paternal Grandmother's custody time. Mother did not seek a change in legal custody of Child either by petition or orally before the trial court. In fact, the first reference in the record to a change in Father's legal custody appeared in the trial court's memorandum announcing that change. *See* Mem. at 11. Like the appellants in *P.H.D.* and *Langendorfer*, who had no notice that custody modification was a matter before the court during their

contempt hearings, Father had no advance notice that his legal custody would be an issue before the court and no time to develop any legal or factual arguments. Father's loss of legal custody without any ability to defend his right to share in "major decisions on behalf of . . . [C]hild, including, but not limited to, medical, religious, and educational decisions," 23 Pa.C.S. § 5322, offends our traditional notions of due process, which, at a minimum, require notice and an opportunity to be heard before stripping parents of their fundamental liberty "interest . . . in the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality) (citations omitted).

Further, as we explained in *Langendorfer*, absent notice to the parties that legal custody was at issue, the trial court could not "assume that the parties ha[d] either sufficiently exposed the relevant facts or properly argued their significance." 797 A.2d at 309 (quoting *Choplosky*, 584 A.2d at 342). Thus, neither "we nor the trial court can make an informed, yet quintessentially crucial judgment as to whether it was in the best interests" of Child to award Mother sole legal custody. *Choplosky*, 584 A.2d at 343. Here, the trial court provided no notice that legal custody would be subject to review and issued a decision without giving the parties a chance to explain their positions, let alone present evidence or argument, with respect

to Father's legal custody rights.[17]  Such *sua sponte* determinations of legal custody rights that bear on the child's medical, religious, and educational needs fail to meet the minimum standards of due process.[18]

Next, we address Father's contention that the trial court abused its discretion by decreasing Paternal Grandmother's custody time.[19]  According to Father, Paternal Grandmother "lost significant custody rights to [Child]," which were not "excessive or burdensome such that it interfered with the parent child relationship."  Father's Br. at 15-16 (citing ***Johnson v.***

---

[17] On this record, which shows that neither Mother nor the trial court provided Father **any** notice that legal custody would be at issue, we decline to articulate the minimum requirements for adequate notice.

[18] Our decision today in no way limits the power of trial courts to fashion appropriate custody orders when all parties are on notice that physical and/or legal custody is at issue.  The Child Custody Act provides trial courts with a great deal of flexibility to award different types of custody so long as they consider the factors set forth under section 5328 in the best interests of the child.  ***See*** 23 Pa.C.S. § 5323; ***D.K.D. v. A.L.C.***, 141 A.3d 566, 572 (Pa.Super. 2016) ("The primary concern in any custody case is the best interests of the child.").

[19] Father may challenge the reduction of Paternal Grandmother's custody time because Father's visitation time hinges on Paternal Grandmother's ability to take custody of Child on weekends.  Therefore, a reduction in Paternal Grandmother's custody time may have an adverse effect on Father's visitation and, for purposes of this appeal, he is an "aggrieved party" within the definition of Pa.R.A.P. 501.  ***See In re J.G.***, 984 A.2d 541, 546 (Pa.Super. 2009) ("This Court has consistently held that for purposes of Pa.R.A.P. 501, '[a] party is "aggrieved" when the party has been adversely affected by the decision from which the appeal is taken.'") (quoting ***Ratti v. Wheeling Pittsburgh Steel Corp.***, 758 A.2d 695, 700 (Pa.Super. 2000)).

*Diesinger*, 589 A.2d 1160 (Pa.Super. 1991)). Father argues that "[t]he trial court's findings are not supported by the record, and are based on the mother's dislike of the grandmother." *Id.* at 16. He notes that Paternal Grandmother wanted to know more about Child's mental health issues and how to help with those issues, and that Paternal Grandmother "has demonstrated her love and affection for this child by her words and her actions." *Id.* Father also addresses a concern that Paternal Grandmother's reduction in custody time will "result in a more constrained visitation schedule" with Father. *Id.* at 17.

The trial court did not abuse its discretion when it reduced Paternal Grandmother's custody time. In its memorandum, the trial court discussed both the custody factors under section 5328(a) and the facts relevant to grandparent partial custody under section 5328(c)(1). *See* Mem. at 7-11. The trial court concluded that "child wants to continue to spend most of his time with his mother, to see his father, and to spend less time with his paternal grandmother and his testimony would seem to suggest that all of that would be appropriate." *Id*. at 9. In the trial court's interview, Child stated that he wanted to spend less time with Paternal Grandmother. N.T. Modification H'rg, 3/23/16, at 58. Child also stated that he dislikes the work Paternal Grandmother has him perform during his weeklong summer visit, including moving junk and burning leaves and other garbage, which irritates his asthma. *Id.* at 53-55. In addition, Mother testified that Child experiences a noticeable increase in anxiety, including his Tourette's

Syndrome tics, before and after his visits with Paternal Grandmother. *Id.* at 9-10.

The trial court also found that Paternal Grandmother's custody "interferes somewhat with the relationship of the child with the mother and that [Paternal Grandmother's custody] is not in the best interest of the child since it takes considerable time from the mother/child relationship." Mem. at 11. The record supports this finding. The trial court discussed Mother's role as the "stability in the child's life since . . . [F]ather's incarcerat[ion]," her ability to attend to Child's daily needs, and her availability to care for Child. *Id.* at 8-9. Further, the trial court considered Paternal Grandmother's custody time as a means of assuring visitation and contact with Father, concluding that "it is in the best interest of the child to have some continuing consistent contact with the paternal grandmother, both for contact with her and for her aid in making sure that [Child] has some contact with his father in prison." *See id.* at 10. We conclude that the trial court appropriately exercised its discretion in reducing a portion of Paternal Grandmother's custody time while ensuring that Paternal Grandmother continues to receive appropriate time with Child, not only for herself but also to visit Father.[20]

_____

[20] In his brief, Father also asserts that the trial court abused its discretion in ordering Paternal Grandmother to pay the transportation costs associated with visiting Father at SCI-Fayette. According to Father, Mother should bear this cost because she "should also be responsible to ensure the
*(Footnote Continued Next Page)*

Order affirmed in part and vacated in part. Jurisdiction relinquished.

President Judge Gantman and President Judge Emeritus Stevens, concur in the result.


Judgment Entered.

*[signature]*

Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/13/2017

---

*(Footnote Continued)*

child visits . . . . [F]ather in prison, since it is in fact in the best interest of the child." We disagree. The trial court found, as supported by the record, that Paternal Grandmother's custody is primarily a means to ensure that Child's visits with Father continue. Further, the trial court noted that Mother is already giving up custody time to allow Paternal Grandmother to bring Child to see Father. Considering Mother's prior history of financial troubles that prevented her from bringing Child to SCI-Fayette and Paternal Grandmother's voluntary intervention to not only have custody of Child but also ensure that Child visits Father, we discern no abuse of discretion in the trial court's decision to impose transportation costs to SCI-Fayette on Paternal Grandmother.